IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| DAVID FIELDS, | CASE NO. 1:23-cv-1340 |
| Petitioner, | DISTRICT JUDGE |
| | PATRICIA A GAUGHAN |
| vs. | |
| | MAGISTRATE JUDGE |
| WARDEN NORM ROBINSON, | JAMES E. GRIMES JR. |
| Respondent. | |
| | **REPORT AND RECOMMENDATION** |

David Fields filed a Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. Doc. 1. Fields is currently in custody at the Southeastern Correctional Institution serving an aggregate sentence of fifteen years' imprisonment imposed by the Cuyahoga County Court of Common Pleas in *State v. Fields*, Case Nos. CR-17-622275, CR-18-627546, and CR-18-632955. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court deny Fields's petition.

### Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). "This presumption also applies to the factual findings that [a] state appellate court makes on its review of the state trial record." *Johnson v. Bell*,

525 F.3d 466, 474 (6th Cir. 2008). The petitioner has the burden of rebutting

that presumption by clear and convincing evidence. *Id*.

The Ohio Court of Appeals for the Eighth Appellate District summarized

the facts underlying Fields's conviction following his first trial as follows:

> {¶2} Fields was charged in three separate
> indictments related to incidents involving the theft
> of cigarettes from three different delivery trucks
> between February and July 2017. In one indictment,
> Fields was charged with theft, a felony of the fifth
> degree in violation of R.C. 2913.02, for stealing
> cigarettes from a delivery truck in Westlake on
> February 23, 2017 ("the Westlake Incident"). A
> second indictment, for the robbery of a cigarette
> truck in Lakewood on June 9, 2017, charged Fields
> with aggravated robbery, a felony of the first degree
> in violation of R.C. 2911.01(A)(1) with a firearm
> specification; kidnapping, a felony of the first degree
> in violation of R.C. 2905.01(A)(2) with a firearm
> specification; and having weapons while under
> disability, a felony of the third degree in violation of
> R.C. 2923.13(A)(2) ("the Lakewood Incident"). A
> third indictment charged Fields with aggravated
> robbery, a felony of the first degree in violation of
> R.C. 2911.01(A)(1) with a firearm specification;
> robbery, a felony of the second degree in violation of
> R.C. 2911.02(A)(2) with a firearm specification; and
> having weapons while under disability, a felony of
> the third degree in violation of R.C. 2923.13, for the
> robbery of a cigarette truck in Cleveland on July 13,
> 2017 ("the Cleveland Incident").
>
> {¶ 3} The court ultimately dismissed the charges
> related to the Lakewood Incident only.
>
> {¶4} The trial court found Fields guilty of having
> weapons while under disability. The jury returned a
> guilty verdict on all remaining counts.
>
> {¶5} For the Westlake Incident, Fields was
> sentenced to six months in prison. For the Cleveland

Incident, Fields was sentenced to three years in prison for the firearm specification, three years in prison for aggravated robbery, and two years in prison for having weapons while under disability. The trial court ordered the firearm specification and aggravated robbery sentences to run consecutively and the remaining sentences to run concurrently. In total, Fields was sentenced to six years in prison on the charges pertinent to this appeal.

{¶6} Fields timely appealed his convictions related to the Cleveland and Westlake Incidents and the trial court's imposition of consecutive prison sentences.

II. Trial

A. Fields's Removal from the Courtroom

{¶7} Prior to jury selection, Fields requested to represent himself with a new attorney as standby counsel. The trial court explained to Fields that he would be fully responsible for his own defense and that his current attorney would serve as standby counsel. Fields began arguing with the court about his lawyer, prompting the court to warn Fields, "[i]f when that jury's out here and you get argumentative like you are now and you're not listening to what I'm saying, I'm going to put you back in that holding cell. I'm going to put a little speaker in there so you can hear what's going on, but you won't be participating at all." A lengthy back-and-forth between Fields and the trial judge ensued, with Fields demanding a new attorney be appointed to represent him. The judge eventually told him that he could not have a new attorney and again warned Fields that "if you keep blurting out, you'll be sitting in the holding cell during trial."

{¶8} Fields continued complaining that he wanted a new attorney, telling the trial court, "I said I don't want to participate. You can't — you can't make me stay in the court." The judge ordered Fields removed from the courtroom. Fields's counsel did not object.

3

Rather than moving forward with jury selection, the court adjourned for the day stating:

> I'm thinking that we're going to do for the rest of the day is we may just adjourn early. * * * The defendant will have the opportunity to participate and be in the courtroom. If he refuses, then we will have the microphone set up. Each of you will have a microphone, I will have a microphone so that the entire proceedings will be piped into the holding cell in the back.

{¶9} When proceedings resumed the next day, Fields again began badgering, to which the trial judge responded, "[s]o these microphones are set up. You will either be in here and be quiet and respectful or you will sit in the holding cell and we will proceed without you." Fields responded by calling the judge "racist" and accusing her of making threats against him. The judge removed Fields for a second time, again without objection from his attorney.

{¶10} The jury venire entered the courtroom, and the attorneys proceeded with voir dire. At some point while the attorneys were conducting voir dire, Fields was removed from the holding cell and taken to be seen by a medical professional after he complained of chest pains. After jury selection was concluded, the judge noted, outside the presence of the jury, that she had just been made aware of Fields's removal from his holding cell for medical evaluation. Again, there was no objection by counsel. The trial court acknowledged that prior to removal from his holding cell, Fields had been "banging and making an extremely loud amount of noise again disrupting the trial."

{¶11} Outside the presence of the jury, the state raised the issue of Fields's absence from the courtroom and his subsequent removal for medical reasons, expressing concerns about Fields's inability to hear the closed-circuit proceedings. Fields's attorney made no comment or objection. The trial

4

court agreed to include an instruction about Fields's absence in the final jury instructions.

{¶12} On the second day of trial, while the state was questioning a witness, Fields became disruptive and was again removed from the courtroom. The following day, Fields's attorney notified the court that Fields was unable to hear portions of cross-examination. In response, the state noted that while Fields "was in his holding cell there [were] * * * multiple loud [banging] noises presumably from him kicking as he was a couple days prior." The court stated for the record that the "microphones were working * * * they were all working[.]" Fields's attorney made no further comment or objection.

## B. Witness Testimony

{¶13} The jury heard testimony from 13 witnesses. Eight of those witnesses relate to the Westlake and Cleveland Incidents, including the two cigarette truck drivers, three members of the Westlake Police Department, two Cleveland police officers, and a forensic scientist from the state Bureau of Criminal Investigation. The remaining five witnesses testified regarding the Lakewood Incident.

### 1. The Westlake Incident

#### a. Bradley Heilman

{¶14} Bradley Heilman ("Heilman") was the cigarette truck delivery driver involved in the Westlake Incident. He testified that on February 23, 2017, he was driving a cigarette delivery truck for Core-Mark. Routes were weekly with drivers being assigned specific routes every day of the week. When Heilman finished making his delivery at 23709 Center Ridge Road in Westlake ("the Westlake Rite Aid"), a car "flew up behind [his] trailer." He described the car as an "olivy [sic] green Ford Taurus" with three men inside. The car pulled up behind the truck's trailer, and two men "jumped out of the passenger side of the car." "One guy opened

5

the trailer door and one guy jumped in." The man outside the truck stood "at the back of the trailer. And the guy inside threw the boxes of cigarettes to him and then * * * he jumped out and they both jumped in the car." While the men were unloading the cigarettes, Heilman tried to take pictures of the car with his cellphone but as soon as he got his phone out, "the car took off in reverse around the corner of the building" before exiting the parking lot. When the car took off, Heilman ran after it and continued taking pictures. Heilman returned to his truck and called the police.

{¶15} Heilman described the two men who got out of the car as black males wearing dark-colored hoodies with the hoods up on their head. Their faces were covered. He described the driver as a heavy-set black male.

{¶16} According to Heilman, the men stole between 25 and 28 cartons of cigarettes, which had a value of approximately $1,000.

{¶17} On March 2, 2017, while on the same delivery route, Heilman noticed a gray Ford Taurus that he believed had three men inside across the street from one of his delivery locations. Heilman was suspicious of the car because it was the same make and model as the car from a week prior with the "30-day tag sitting on it just like the other one * * *." When Heilman pulled away from the delivery location, the Ford Taurus began following him. Once he noticed the car following him, Heilman called the police to report the suspicious activity. "I told them they were following me again, same car or similar car, same body style." The police instructed Heilman to pull into the store where he was making his next delivery and stay inside the truck. Heilman followed those instructions. The gray Ford Taurus "pulled in across the street to a car dealership and parked so [the men] could see [him]." When asked why he believed the car "parked so [the men] could see [him]," he responded, "[t]here's a million parking spots in there but they picked one up by the road where the car was

6

facing the back of my trailer." Soon after Heilman pulled in, two Westlake Police cruisers arrived. One came to where Heilman parked; the other went across the street and approached the gray Ford Taurus. According to Heilman, the men were removed from the vehicle and, afterwards, a female officer told him, "none of the stories matched and they were taking [the men] into custody." The police did not ask Heilman to identify whether these men were the same men who had stolen the cigarettes from his truck on February 23, 2017.

{¶18} Heilman testified that at the time of the February 23, 2017 theft, he only saw the driver of the green Ford Taurus through the windshield. The driver never exited the car. However, Heilman stated he was "close enough to the car that [he] could see it was a bigger guy." He based that assertion on seeing the driver's arms, chest, and head. While he did not conclusively identify Fields as the driver, when asked if Fields was the driver, Heilman responded "[h]e does look similar to that gentleman."

### b. Mark Arcuri

{¶19} Mark Arcuri ("Arcuri") is a Westlake Police Department patrolman who, on February 23, 2017, responded to a call for assistance at the Westlake Rite Aid at approximately 9:30 a.m. Dispatch reported that a theft had just occurred at that location. The suspect vehicle was a green Ford Taurus with a temporary license plate.

{¶ 20} Upon arriving at the scene, Arcuri interviewed Heilman. From that interview, Arcuri learned that three black men had stolen cigarettes from Heilman's truck before speeding away in a green Ford Taurus. Specifically, Arcuri learned that "[t]wo [men] had gotten out of the vehicle and were taking cigarettes from the back of [Heilman's] vehicle and a third one stays in the vehicle, the driver, and he was wearing a hoodie."

7

### c. Nicolas Ribich and Patricia Weisbarth

{¶21} Nicholas Ribich ("Ribich") is a Westlake police patrolman and Patricia Weisbarth ("Weisbarth") is a Westlake detective. On March 2, 2017, Ribich and Weisbarth each separately responded to a call for assistance at the Westlake Rite Aid at approximately 9:33 a.m. At the time, Weisbarth was already investigating the February 23, 2017 theft of over $1,000 in cigarettes from a delivery truck. Weisbarth identified Heilman as the delivery truck driver on both February 23, 2017, and March 2, 2017.

{¶22} Ribich described the vehicle parked across the street from the Westlake Rite Aid in the AutoNation parking lot as a silver Ford Taurus. Patrol officers were the first to arrive at the scene. They approached a silver Ford Taurus and discovered two men inside. The driver identified himself as "Purefoy." The passenger identified himself as "Marvin Tompkins." After investigation by detectives, Ribich and Weisbarth learned that "Tompkins" was a false name. The man's actual name was David Fields, whom Ribich identified in court as the defendant. Additionally, Ribich reported that the stories Purefoy and Fields gave to the officers were inconsistent.

{¶23} When Weisbarth arrived at the AutoNation parking lot across from the Westlake Rite Aid, two men had already been removed from the suspect silver Ford Taurus to be interviewed separately. Weisbarth spoke to Fields at the scene. Fields told her that his friend, Purefoy, had picked him up "to go for a ride to meet somebody." After speaking with the officers who spoke with Purefoy, Weisbarth also determined that the two men's stories did not match.

{¶24} Weisbarth testified that the silver Ford Taurus Purefoy and Fields were in was registered to Crystal

Williams ("Williams"). Weisbarth's investigation revealed that Williams also had a green Ford Taurus registered in her name. Fields told Weisbarth that he and Williams were in a relationship together. Weisbarth called Williams on the phone. After Weisbarth was finished speaking with Williams, Fields spoke to Williams. According to Weisbarth, Fields said "something to the effect of you know I don't take your car or I'm not the person who was driving" and it appeared to Weisbarth that Fields "was trying to coach [Williams] into what to say to [the police]."

{¶25} Fields gave Weisbarth his cell phone number when she interviewed him on March 2, 2017. Weisbarth then "obtain[ed] a court order for the location data of Mr. Fields's cell phone." According to that data, on February 23, 2017, at 9:24 a.m., approximately nine minutes before Heilman's call to the police, Fields's phone was located in Westlake pinging off of a cell "tower at 2110 Columbia Road." That tower is "approximately 1.4 miles away from the scene of the theft * * *" in the Westlake Incident.

{¶26} On March 2, 2017, the silver Ford Taurus was towed from the parking lot. No guns or cigarettes were found inside.

### 2. The Cleveland Incident

#### a. Lawrence Fields

{¶27} On July 13, 2017, Lawrence Fields ("Lawrence") was a truck driver making cigarette deliveries in the Cleveland area. His last delivery of the day was at 11:30 a.m. for Ecke's Towing Company "located at 1690 Columbus Road in Cleveland" in the Flats. Lawrence recalled that he had gotten the delivery prepared by the door of his truck when "a car came flying around from the back of the parking lot, stopped at the tail of the truck, and two guys got out."

{¶28} Both of the men came from the rear passenger side of the car. According to Lawrence, when the first man exited the car, he had a mask on but then removed the mask, "[a]nd then he started towards [Lawrence] and he had his hands in his pocket and he took his right hand out, showed [him] he had a weapon, a gun * * *." At that time, Lawrence backed away from the man so as not to interfere. The man put the gun back into his pocket.

{¶29} The two men loaded cigarettes into their car. According to Lawrence, they took two or three cases of cigarettes, which had 30 cartons per case. After taking the cigarettes, the two men got back into the car and drove away. Once the men drove away, Lawrence called 911 to report the robbery.

{¶30} Lawrence described the gunman as a black man wearing dark clothing and a hat. The second man was also black wearing a "white ball cap" and dark clothing. Lawrence stated that he could not definitively make out either of the men's faces because of the hats they were wearing. Lawrence stated that there was a third man in the car, the driver, who never got out. According to Lawrence, all of the men were clean shaven; however, he stated that it had been two years since the incident and he could not remember conclusively. Asked if Fields was the man in the white ball cap, Lawrence stated he believed it was him.

{¶31} Lawrence described the car as a gray or silver Chevrolet Impala with no license plates.

### b. Mark Stahovec

{¶32} Mark Stahovec ("Stahovec") is a Cleveland police officer who, on July 13, 2017, responded to a call to investigate a vehicle "parked in a gas station off of Fulton Road" that was believed to have been involved in an aggravated robbery earlier that day. The gas station was the Fulton Gas N Go. His body camera footage showed that he arrived on scene at 1:00 p.m.

{¶33} When he arrived at the Fulton Gas N Go about an hour after the robbery, Stahovec saw a silver Chevrolet Impala, the suspect vehicle, with no front license plate in the parking lot. He proceeded into the gas station convenience store to ask the clerk about reviewing the security camera footage to see who had gotten out of the vehicle.

{¶34} The gas station surveillance video showed the silver Chevrolet Impala pull into the gas station and three black men get out. Two of the men went into the gas station store; the third man, dressed in dark clothing, walked away. Describing the two men who went into the gas station, Stahovec stated that both had gotten out of the passenger side of the car. One had long dreadlocks and was wearing a white t-shirt. The other man had on a black t-shirt.

{¶35} Body camera footage from Stahovec and a fellow officer was shown at trial. According to Stahovec, that footage showed Stahovec looking at the silver Chevrolet Impala when he arrived at the gas station. As Stahovec walked into the gas station, two men are seen exiting the gas station.

{¶36} Stahovec stated that the two men seen entering the gas station in the surveillance video are the same two men he saw, and who can be seen on his body camera footage, exiting the gas station when he entered. The surveillance footage then showed the two men abandoning the silver Chevrolet Impala after exiting the gas station convenience store.

### c. Aaron Reese

{¶37} Aaron Reese ("Reese") is a Cleveland police officer who, in July 2017, was working as a detective for the Cleveland Police Department. He was assigned to investigate the robbery that occurred at Ecke's Towing.

{¶38} As part of his investigation, Reese reviewed the field police report, the body camera footage of the responding police officers, and the surveillance footage from Ecke's Towing and the Fulton Gas N Go.

{¶39} Reese also spoke with Shadi Murra ("Murra"), an owner of the Fulton Gas N Go, who told him that Fields and Cleveland Gresham ("Gresham") have approached Murra on several occasions trying to sell stolen cigarettes.

{¶40} Upon reviewing the body camera footage, Reese identified the two men exiting the store as Fields and Gresham. He believed that these two men fit the description of the men who had committed the July 13, 2017 aggravated robbery. Asked why he believed that, Reese responded, "[s]imilar crimes were occurring in surrounding areas and so I had already seen other surveillance video involving them." Further, Reese stated once Fields and Gresham were arrested, thefts from cigarette trucks in the area stopped.

{¶41} The silver Chevrolet Impala was towed from the Fulton Gas N Go and processed as part of the investigation. Cartons of stolen cigarettes were recovered from the vehicle. A beer can, which had condensation on it at the time the car was towed, and a few other items in the car were tested for fingerprints and DNA. Items from the car came back as having DNA from Fields and Gresham. Reese testified that the silver Chevrolet Impala was registered to David Fields.

{¶42} Reese's review of the surveillance footage showed two men exiting the Chevrolet Impala on the passenger side. Reese identified those two men as Fields and Gresham. According to Reese, a statement provided by Lawrence described Gresham as the driver during the robbery. Reese explained that sometime in the hour between the robbery and the suspects' arrival at the Fulton Gas N Go, either the men switched seats in the car, or it was possible

that the occupants of the car could have changed. However, Reese testified that he believed the three occupants of the car who exited it at the Fulton Gas N Go were the same three men who robbed Lawrence at Ecke's Towing. Asked why that was his belief, Reese responded "the cigarettes in the trunk of that car, there's evidence in the car in terms of DNA and fingerprints that are linked to those guys * * *." Additionally, Reese found it unusual that Fields and Gresham abandoned the vehicle after walking past police when they left the Fulton Gas N Go, stating "[t]hey don't want to have anything to do with that car which I think is unusual because if it's your car you're going to get in your car and leave."

### d. Heather Bizub

{¶43} Heather Bizub ("Bizub") is a forensic scientist at the Bureau of Criminal Investigation. Bizub testified as an expert in forensic DNA analysis.

{¶44} Bizub explained that the Cleveland police department sent over the following items to be tested for DNA:

> [I]tem 1 was an envelope containing swabs of cigarette cartons found in the trunk.
> Item 2 was an evidence envelope containing swabs from a bottle recovered from vehicle.
> Item 3 was an evidence envelope containing swabs from a can recovered from the vehicle.
> Item 4 was an evidence envelope containing swabs from a bottle from the vehicle.
> Item 5 was an evidence envelope containing swabs from the door handle, steering wheel and gear shift of the vehicle.
>
> * * *
>
> [I]tem 6 was the DNA standard from David Fields and item 7 was the DNA standard from Cleveland Gresham.

> {¶ 45} According to Bizub, items 1 and 3 were not suitable for DNA comparison because they had a "[v]ery low amount of DNA on" them. The DNA on items 2 and 4 was consistent with Gresham. The DNA on item 5 was "consistent with David Fields. The profile frequency is rarer than one in one trillion."

*State v. Fields*, 2022-Ohio-620, 2022 WL 622286, at *1–6 (Ohio Ct. App. 2022).

## Procedural background

Fields was convicted in two separate trials, one in October and November 2019 (the First Trial), *see* Doc. 7-1, at 177, 179, which resulted from indictments in April and September 2018, *id*. at 138, 147–49, and one in February 2020 (the Second Trial), *see id*. at 15, 17, which resulted from a 2017 indictment, *see id*. at 7–13. As is discussed below, Fields's petition concerns the First Trial, which resulted from his second and third indictments. As it relates to the Second Trial and his appeal from that conviction, Fields's petition is untimely. For the sake of completeness, however, both cases are discussed below, beginning with the Second Trial, which was initiated by the first indictment in 2017.

### 1. The Second Trial

A Cuyahoga County grand jury indicted Fields in October 2017, on two counts of aggravated robbery, two counts of kidnapping, and two counts of having weapons under disability. Doc. 7-1, at 7–13. In February 2020, a jury found Fields guilty on all counts. *Id*. at 17. That month, the trial court

sentenced Fields to an aggregate term of fifteen years' imprisonment. *Id*. at 18–19.

Fields filed a timely notice of appeal. *Id*. at 21. The Ohio court of appeals affirmed on June 6, 2021. *Id*. at 90–100.

Fields filed a timely notice of appeal with the Ohio Supreme Court. *Id*. at 101–02. On September 28, 2021, the Ohio Supreme Court declined under rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id*. at 128. Fields filed a motion for reconsideration, *id*. at 129–32, which the court denied on December 14, 2021, *id*. at 137.

### 2. The First Trial

In April 2018, a Cuyahoga County grand jury indicted Fields on one count of theft, in violation of Ohio Revised Code § 2913.02(A)(1). Doc. 7-1, at 138. The next month, the trial court referred Fields to a psychiatric clinic for evaluation. *Id*. at 140. Because Fields "refused or was unable to cooperate with the evaluation," the trial court in June 2018 referred him to a facility for an "inpatient competency evaluation." *Id*. at 141. At a hearing in July 2018, the parties stipulated to a report signed by Jeffrey Khan, M.D., who opined "with reasonable medical certainty that [Fields] ha[d] the ability to understand the nature and objective of the court proceedings against him and ha[d] the capacity to assist in his own defense." *Id*. at 143.

In August 2018, Fields filed a pro se "notice of termination of representation," in which he detailed why he purported to "terminat[e]" his

counsel's representation of him. *Id*. at 144–45. The trial court then assigned Fields new counsel. *Id*. at 146.

In September 2018, a Cuyahoga County grand jury indicted Fields on one count of aggravated robbery, in violation of Ohio Revised Code § 2911.01(A)(1), one count of robbery, in violation of Ohio Revised Code § 2911.01(A)(2), and one count of having weapons under disability, in violation of Ohio Revised Code § 2923.13(A)(3). *Id*. at 147–49. On the State's unopposed motion, *see id*. at 152–56, the trial court consolidated the case under the April 2018 indictment with the case under the September 2018 indictment, *id*. at 157.

Following a trial, Fields was found guilty in November 2019, of all counts. *Id*. at 179. In late February, 2020, the trial court sentenced Fields to six months' imprisonment on his theft conviction in the April 2018 indictment and directed that the sentence be served concurrent to the sentence imposed for his convictions following the Second Trial—which had just completed—and his September 2018 indictment. *Id*. at 183. The trial court then sentenced Fields to an aggregate fifteen-year term of imprisonment on his convictions— based on the September 2018 indictment—for aggravated robbery, robbery, and having weapons under disability. *Id*. at 185–86. In doing so, the trial court explained that portions of Fields's sentence would be served consecutive to portions of the sentence imposed for his conviction in the Second Trial. *Id*. at 185.

Fields filed a timely notice of appeal. *Id*. at 187. After the court of appeals consolidated Fields's appeals related to the First Trial—the one that resulted from two indictments in 2018—*id*. at 200, he filed a brief in support of his appeals, *id*. at 201–45. In his brief, Fields raised seven assignments of error. In his first assignment of error, Fields alleged that the trial court improperly joined his two 2018 cases. *Id*. at 214–20. In his fifth assignment of error, he alleged ineffective assistance of counsel for failure to (1) seek severance, (2) counter false or misleading claims, and (3) ensure competency. *Id*. at 233–41. The Ohio court of appeals affirmed on March 3, 2022. *See Fields*, 2022 WL 622286.

In April 2022, Fields filed a notice of appeal with the Ohio Supreme Court. Doc. 7-1, at 329–30. In his memorandum in support of jurisdiction, Fields raised the following proposition of law:

> For purposes of a claim of ineffective assistance of counsel, the presumption of reasonable trial strategy is rebutted by trial counsel's consistent passive waiver of the defendant's constitutional rights during a trial, without any strategic or tactical purpose whatsoever.

Doc. 7-1, at 337.

On July 5, 2022, the Ohio Supreme Court declined under rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id*. at 362. Fields did not seek review in the United States Supreme Court.

*Federal habeas proceedings*

Fields filed a petition for writ of habeas corpus on June 28, 2023. Doc. 1, at 17; *see Houston v. Lack*, 487 U.S. 266, 270 (1988) (holding that an imprisoned petitioner's petition is deemed filed when he places it in his prison's mailing system). He raises the following ground for relief:

> Whether reasonable trial strategy is rebutted by counsel's waiver of constitutional rights at trial without formulated strategy or tactics without purpose.

Doc. 1, at 7. The Warden filed a return, Doc. 7, Fields filed a traverse, Doc. 10, and the Warden filed reply to Fields's traverse, Doc. 12.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 104, 110 Stat. 1214 (AEDPA or "the 1996 Act"), habeas petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id*. (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).

18

But when "state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Robinson v. Horton*, 950 F.3d 337, 343 (6th Cir. 2020). To exhaust his remedies, a state defendant with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003). And a habeas petitioner must "present[] both the factual and legal basis for [the] claims to the state courts." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). This means that the "'petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law.'" *Williams*, 460 F.3d at 806 (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). "'[G]eneral allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that specific

19

constitutional rights were violated.'" *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (quoting *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

   *Procedural default*

   Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." Id. In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

   Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary

appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting O'Sullivan, 526 U.S. at 848); *see Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015) ("When a petitioner has failed to fairly present … claims to the state courts and no state remedy remains, [the] claims are considered to be procedurally defaulted.") (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)). While the exhaustion requirement is technically satisfied in this circumstance because state remedies are no longer available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or show that a "fundamental miscarriage of justice" will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218, 231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must then show that the state court's adjudication "was contrary to," or "involved an

21

unreasonable application of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A]n 'unreasonable application of'" the Court's holdings is one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law'" refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting 28 U.S.C. § 2254(d)(1) and *Woodall*, 572 U.S. at 419). A state court is not required to cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases, "so long as neither the reasoning nor the result of the

state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *see Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Discussion**

*1.    Fields petition is time-barred as it relates to his Second Trial*

The 1996 Act provides a one-year limitations period in a habeas action brought by a person in custody from a state court judgment. Under 28 U.S.C. § 2244(d)(1), the limitation period runs from the latest of—

> (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The Warden argues that Fields's petition is time-barred as it relates to the Second Trial. Doc. 7, at 17–18. Fields tacitly concedes that his petition is untimely but argues that he is entitled to equitable tolling. Doc. 10, at 2.

As a threshold matter, under Section 2244(a)(1)(A), a judgment becomes final at the "conclusion of direct review or [on] the expiration of the time for seeking such review." The Ohio Supreme Court declined on September 28,

2021, to accept jurisdiction over Fields's appeal as the Second Trial. Doc 7-1, at 128. Fields filed a motion for reconsideration, *id.* at 129–32, which the court denied on December 14, 2021, *id.* at 137. Assuming without deciding that the pendency of Fields's reconsideration motion tolled the time to seek review in the United States Supreme Court, Fields had 90 days from December 14, 2021—until March 14, 2022—to file a petition for writ of certiorari. *See* Sup. Ct. R. 13. But Fields did not file a certiorari petition, so his limitations period began running the next day, *see Bronaugh v. Ohio*, 235 F.3d 280, 285 (6th Cir. 2000) (the statute of limitations begins running the day after the event or default), and expired one year later, on March 15, 2023. Fields, however, filed his petition on June 28, 2023. It is therefore untimely as to the Second Trial.

Fields, though, says that he entitled to equitable tolling because he "is severely mentally ill, … was confined for a portion of the litigation at trial, and transf[err]ed to a psychiatry[i]c facility that did not allow him to conduct legal research." Doc. 10, at 2; *see id.* at 3 (stating that he is bipolar and schizophrenic and was diagnosed at age 12 as mentally handicapped). He adds that "[a]fter sentencing," restrictions related to "Covid-19 further prevented him [from] conducting legal research for tolling." *Id.* at 3. Finally, Fields notes that he is unrepresented and has lacked library access. *Id.*

Because the limitations period in Section 2244(d)(1) "is not jurisdictional," it "may be tolled for equitable reasons." *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 851 (6th Cir. 2017). To warrant equitable tolling, a habeas

petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)). And "mental incompetence can constitute an extraordinary circumstance," *id.*, but only if the petitioner shows "that (1) he is mentally incompetent and (2) his mental incompetence caused his failure to comply with AEDPA's statute of limitations." *Ata v. Scutt*, 662 F.3d 736, 742 (6th Cir. 2011). Because a petitioner must establish "a causal link between the mental condition and [an] untimely filing," "a blanket assertion of mental incompetence is insufficient to toll the statute of limitations." *Id.* Courts must thus "take care to only apply the equitable tolling doctrine 'sparingly.'" *Watkins*, 854 F.3d at 851.

Assuming that Fields has shown that he diligently pursuing his rights, he has not carried his burden to show that an extraordinary circumstance stood in his way. Fields first asserts that he is mentally ill. Doc. 10, at 3. But "mental illness is not the same as mental incompetence." *See Cowans v. Bagley*, 639 F.3d 241, 247–48 (6th Cir. 2011). And Fields has presented no evidence of mental incompetence during the limitations period. *See Watkins*, 854 F.3d at 851–52 (noting this omission).

Further, the record does not support Fields assertion. He was examined following the trial court's order and he stipulated to the resulting report finding him competent. Doc. 7-1, at 143. Additionally, the Ohio court of appeals found, as a factual matter, that "at various stages throughout his trial," Fields made

26

comments that "demonstrate[d] that [he] understood the nature of the charges against him and was able to assist in his defense." *Fields*, 2022 WL 622286, at *15. This finding is subject to deference in this Court. *See Cowans*, 639 F.3d at 248. The record thus belies Fields's assertion. *Cf. Kitchen v. Bauman*, 629 F. Appx 743, 748 (6th Cir. 2015) (noting that claimed incompetency was "contradicted by the record, which show[e]d that [the] petitioner was declared competent to stand trial months before he was tried"). Indeed, Fields's filings in this matter are likewise not indicative of incompetency. *E.g.*, Doc. 10. Finally, Fields provides no causal link between his alleged mental illness and his failure to file a timely petition.

Next, Fields says that he "was confined for a portion of the litigation *at trial*, and transf[err]ed to a psychiatry[i]c facility that did not allow him to conduct legal research." Doc. 10, at 2 (emphasis added). But these facts, which relate to circumstances during Fields's trial, occurred well before the limitations period and are thus irrelevant. And even putting this aside, being confined is an ordinary circumstance for habeas petitioners.

Fields points to restrictions related to COVID-19, which he claims "prevented him [from] conducting legal research *for tolling*." Doc. 10, at 3 (emphasis added). There are at a few problems with this assertion, starting with the fact that whether Fields was able to conduct research *about tolling* is irrelevant to the question of whether COVID-based restrictions affected his ability to file his petition. But even putting that aside, Fields offers nothing

about what the alleged COVID-based restrictions were. And this matters because Fields limitations period ran from March *2022* to March *2023*, between two to three years after the COVID pandemic started. Further, although some courts during the pandemic's early days in 2020 observed that habeas petitioners might be able to base their claim for equitable tolling on COVID-based restrictions, *see Fitzgerald v. Shinn*, No. 19-cv-5219, 2020 WL 3414700, at *2 (D. Ariz. June 22, 2020), *Pickens v. Shoop*, No. 19-cv-558, 2020 WL 3128536, at *3 (S.D. Ohio June 12, 2020), courts' receptiveness to bare COVID-based equitable tolling arguments quickly waned, *see United States v. Sloan*, No. 20-cr-285, 2022 WL 4080631, at *3 (N.D. Ohio Sept. 6, 2022) (considering a petition under 28 U.S.C. § 2255), *certificate of appealability denied*, No. 22-3808, 2023 WL 6296602 (6th Cir. Mar. 31, 2023); *United States v. West*, 578 F. Supp. 3d 962, 966–67 & n.2 (N.D. Ohio 2022) (citing cases). Fields offers nothing to show that COVID-based restrictions "specifically prevented him from filing his motion." *United States v. Henry*, No. 17-cr-180, 2020 WL 7332657, at *4 (W.D. Pa. Dec. 14, 2020); *see Pryor v. Erdos*, No. 20-cv-2863, 2021 WL 4245038, at *9 (N.D. Ohio Sept. 17, 2021) ("a petitioner seeking tolling" based on COVID-19 restrictions "must still demonstrate fact-specific circumstances related to the pandemic that hindered his ability to timely file a habeas petition"), *certificate of appealability denied*, No. 21-3908, 2022 WL 1021911 (6th Cir. Mar. 31, 2022), *cert. denied*, 143 S. Ct. 272 (2022).

28

Finally, Fields notes that he is unrepresented and has lacked library access. Doc. 10, at 3–4. Neither of these facts constitutes an extraordinary circumstance. *See Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012); *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 752 (6th Cir. 2011).

Fields has not shown that some extraordinary circumstance stood in his way and prevented him from timely filing his petition. He is thus ineligible for equitable tolling and his petition as it relates to the Second Trial is untimely.

### 2. As to Fields's First Trial, Fields's claims are procedurally defaulted in part, and otherwise meritless

In his sole ground for relief in his habeas petition, Fields asserts that his trial counsel was ineffective. He and presents six subclaims for relief, claiming ineffective assistance for not (1) moving for a new trial, (2) objecting during "just about the whole trial," (3) moving to sever, (4) "counter[ing] false statements," (5) ensuring that Fields was competent, and (6) consulting an expert's laboratory report. Doc. 1-1, at 4, 6. Before Ohio's Supreme Court, however, Fields argued only that his counsel was ineffective for failing to (1) "seek severance," (2) counter misleading evidence related to the fact that a vehicle found near an incident was owned by Fields son, David Fields, Jr., rather than Fields, and (3) ensure Fields's competency. Doc. 7-1, at 337–42. So Fields failed to present his first, second, and sixth subclaims to the Ohio Supreme Court.

29

*2.1. Subclaims one, two, and six are defaulted*

As noted, a habeas petitioner with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (citation omitted). In this regard, Ohio has a "dual-track system" for raising ineffective-assistance-of-counsel claims. *See Hill v. Mitchell*, 842 F.3d 910, 936 (6th Cir. 2016). Grounds for relief that are "based on evidence wholly within the trial record must be brought on direct appeal." *Id*. "[C]laims based on evidence outside the trial record," on the other hand, "cannot be brought on direct review and must be raised in a petition for state post-conviction relief." *Id*. And if an ineffective-assistance claim "relies on evidence within the trial record" such that the claim could have been brought on direct appeal, Ohio's res judicata rule will bar post-conviction review of the claim. *Id*. "Ohio courts routinely apply the res judicata rule to" such claims. *Smith v. Bagley*, 642 F. App'x 579, 586 (6th Cir. 2016) (citing *State v. Cole*, 443 N.E.2d 169, 171 (1982)); *see Williams*, 460 F.3d at 806 ("Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised on direct appeal, the claim is procedurally defaulted.") (citing *Engle v. Issac*, 456 U.S. 107, 125 n.28 (1982)).

Fields's first and second subclaims—that counsel was ineffective for not (1) moving for a new trial, or (2) objecting during "just about the whole trial"—rely on evidence in the trial record. Doc. 1-1, at 4. As a result, Fields was required to raise these claims, if at all, on direct appeal. *See Hill*, 842 F.3d at

936. But Fields did not raise them. And because a record-based ineffective-assistance claim must be raised on direct appeal, Ohio's res judicata rule would bar Fields from raising it now in a state post-conviction petition. *See Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007). As a result, Fields has procedurally defaulted his first and second subclaims. *Id.*; *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994) ("Rust is barred from presenting his constitutional claims to the state courts because he had the opportunity to raise the issues during the course of his direct appeal but failed to do so.").

Fields sixth subclaim is that his counsel was ineffective for not consulting an expert's laboratory report. Doc. 1-1, at 6. This claim necessarily rests on evidence outside the trial record. *Cf. Buckley v. Ohio*, No. 5:19-cv-424, 2020 WL 5603768, at *8 (N.D. Ohio Aug. 18, 2020) (explaining that a claim that counsel failed to conduct an "adequate investigation," was "based in part on evidence outside the trial record"), *report and recommendation adopted*, 2020 WL 5593099 (N.D. Ohio Sept. 18, 2020). Under Ohio Revised Code § 2953.21(A)(2), any petition for post-conviction relief must be filed within 365 days of the date the trial transcript is filed with the court of appeals. Fields's record was filed on June 8, 2020. Doc. 7-1, at 404. So Fields's time to file a petition for post-conviction relief expired in June 2021, which was before he filed his habeas petition. Any post-conviction petition that Fields might file now would be untimely and time-barred from merits review. *See Rowe v. Buchanan*, No. 2:12-cv-141, 2012 WL 4756600, at *5 (S.D. Ohio Sept. 6, 2012),

*report and recommendation adopted*, 2012 WL 4758037 (S.D. Ohio Oct. 5, 2012). As a result, Fields's sixth subclaim for relief is procedurally defaulted.[1] *See Awkal v. Mitchell*, 613 F.3d 629, 646 (6th Cir. 2010).

Fields could avoid this default by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law."[2] *Coleman*, 501 U.S. at 750. But although he recognizes that the Warden argued that he defaulted some of his subclaims, Doc. 10, at 6, Fields does not claim that he can show cause, *see id.* at 6–9. Indeed, given that he presented some of his ineffective-assistance based subclaims to Ohio's courts, it is not clear that he could show cause for his failure to raise the defaulted subclaims. And without a showing of cause, there is no need to discuss prejudice. *See Hockenbury v. Sowder*s, 718 F.2d 155, 160 (6th Cir. 1983) ("The 'cause' and 'prejudice'

---

[1]    For the sake of completeness, the result would not change if Fields's sixth subclaim were based on evidence within the trial record. In that case, his sixth subclaim would be procedurally defaulted for the same reason that subclaims one and two are procedurally defaulted.

[2]    Fields could also avoid his default by showing that a "fundamental miscarriage of justice" will result if his claims are not considered. *Coleman*, 501 U.S. at 750. But a claimed fundamental miscarriage of justice rests on a showing of actual innocence. *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006); *see Patterson v. Lafler*, 455 F. App'x 606, 609 (6th Cir. 2012). And a claim of actual innocence "requires the petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Fields, however, hasn't presented "new reliable evidence." So there is no need to consider whether he's shown that a "fundamental miscarriage of justice" will result if his claims are not considered.

requirement ... is in the conjunctive. Not finding 'cause' in this case, we need not address the issue of prejudice.").

Fields has thus defaulted subclaims one, two, and six.

### 2.2. Subclaims three, four, and five fail on the merits

Fields presented his third, fourth, and fifth ineffective-based subclaims to the Ohio Supreme Court. A successful ineffective-assistance claim requires a petitioner to demonstrate that: (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Jones v. Bradshaw*, 46 F.4th 459, 487–88 (6th Cir. 2022) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "The first prong is satisfied when a petitioner 'show[s] that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* at 487 (quoting *Strickland*, 466 U.S. at 694). "The second prong is satisfied when the petitioner 'show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 487–88. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 488 (quoting *Strickland*, 466 U.S. at 694). The combined effect of *Strickland* and 28 U.S.C. § 2254(d) results in "'doubly deferential'" review. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "When 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s

33

deferential standard." *Harrington*, 562 U.S. at 105; *Foust v. Houk*, 655 F.3d 524, 533–34 (6th Cir. 2011).

*Strickland* commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 689–90; *Pinholster*, 563 U.S. at 196 ("[t]he Court of Appeals was required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons Pinholster's counsel may have had for proceeding as they did'") (citation omitted). A habeas petitioner bears the burden of overcoming the "presumption that the challenged conduct might be considered sound trial strategy." *Hanna*, 694 F.3d at 612. To carry that burden, the petitioner must "show 'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

Fields says that his counsel was ineffective for not moving to sever, "counter[ing] false statements," or ensuring that Fields was competent. Doc. 1-1, at 4. Here's what the court of appeals had to say about these issues:

> {¶ 92} Next, Fields argues that he was denied the effective assistance of counsel when trial counsel failed to move for severance of the three indictments, when trial counsel failed to object to pieces of the state's evidence, and when trial counsel "did nothing" regarding Fields's alleged declining competency throughout trial.
>
> {¶ 93} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her

attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. To show that he was prejudiced, the defendant must prove that, but for counsel's errors, the result of a trial would have been different. State v. Williams, 8th Dist. Cuyahoga No. 66864, 1995 WL 396369, ——, 1995 Ohio App. LEXIS 2847, 16 (July 5, 1995), citing State v. Mills, 62 Ohio St.3d 357, 376, 582 N.E.2d 972 (1992). The object of an ineffectiveness claim is not to grade counsel's performance. Id. at 697. See also State v. Bradley, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

### 1. Failure to Sever

{¶ 94} Having already overruled Fields's first assignment of error relating to joinder and severance of the indictments and finding that he has not demonstrated prejudice, we find no error in trial counsel choosing not to move for severance after withdrawing Fields's "motion for reconsideration of joinder." Fields's trial counsel withdrew the motion "[i]n light of the recent events * * *." Counsel's decision whether to file a motion for severance is a matter of trial strategy. State v. Benitez, 8th Dist. Cuyahoga No. 98930, 2013-Ohio-2334, ¶ 31. "Trial tactics and strategies do not constitute a denial of effective assistance of counsel." State v. Hawkins, 2019-Ohio-5133, 150 N.E.3d 519, ¶ 27 (8th Dist.), appeal not accepted, 158 Ohio St.3d 1465, 2020-Ohio-1393, 142 N.E.3d 703, ¶ 27. See also State v. Lee, 2018-Ohio-1523, 111 N.E.3d 503, ¶ 14-15 (8th Dist.) (finding trial counsel was not ineffective when the record reflected that counsel considered filing a motion for severance but ultimately chose not to as a matter of trial strategy).

### 2. Failure to Cross-Examine

{¶ 95} Fields argues that his trial counsel was ineffective when he failed to clarify Reese's statement that the Chevrolet Impala involved in the Cleveland Incident was registered to David Fields. Fields argues that the testimony was misleading and prejudicial because the car is actually titled to David Fields, Jr., Fields's son. The state did not ask any questions of Reese to make this clarification, and similarly, Fields's trial counsel did not ask any clarifying questions on cross-examination.

{¶ 96} We note that "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." State v. Conway, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. Whether trial counsel chose to clarify that the Chevrolet Impala at issue in the Cleveland Incident was owned by Fields's son is more akin to trial strategy. Further, evidence at trial established a connection between Fields and the vehicles involved in the Westlake Incident through his connection and relationship with the owner of the vehicles, Williams. Whether Fields or his son owned the silver Chevrolet Impala involved in the Cleveland Incident, Fields does not and cannot demonstrate prejudice. We found that the evidence was sufficient to find Fields guilty of the offenses relating to the Cleveland Incident, and we did so without noting to whom the car was titled. Fields failed to demonstrate that if the clarification occurred, the outcome of the trial would have been different. Accordingly, we do not find this issue to rise to the level of ineffective assistance of counsel.

### 3. Failure to Assess Competency

{¶ 97} Finally, Fields argues that his trial counsel was ineffective for not seeking to have a competency determination made during trial. Fields argues that his trial counsel should have raised the issue of competency at some point during trial as a result of "his repeated outbursts and his well-known pre-existing mental issues."

36

{¶ 98} The United States Supreme Court established the standard for assessing a defendant's competency as whether the defendant "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.'" Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). This standard has been codified in Ohio in R.C. 2945.37(G), which states:

> A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code.

This court has previously held that "[i]t is reasonable to infer that counsel's decision not to pursue the issue of appellant's competence was part of counsel's strategy." State v. Rubenstein, 40 Ohio App.3d 57, 64, 531 N.E.2d 732 (8th Dist.1987). This court noted that a defendant's trial counsel, familiar with the defendant's mental condition, is in the best position to determine whether defendant was capable of assisting with his defense. Id.

{¶ 99} The record demonstrates that Fields understood the nature of the charges against him and was able to assist in his defense. On several occasions, Fields made comments on the record about discovery documents that he asked his counsel to request, his desire for his trial counsel to file certain motions, his recollection of the trial court docket pertaining to motions that had been filed, and his belief that certain witnesses should not be permitted to testify. These statements were made at

> various stages throughout his trial. Therefore, we do not find that Fields's trial attorney was deficient for not raising the issue of competency during trial, because the record does not indicate that Fields did not understand the nature of the charges against him or was unable to aid in his defense.
>
> {¶ 100} For the foregoing reasons, Fields's fifth assignment of error is overruled.

*Fields*, 2022 WL 622286, at *13–15.

In light of *Strickland* and the deference that this Court owes to the court of appeals, Fields's non-defaulted subgrounds don't get far. In considering the court of appeals conclusion about counsel's decision, this Court must "affirmatively entertain the range of possible 'reasons'" for counsel's decision. *Pinholster*, 563 U.S. at 196. But Fields ignores the court of appeals' decision that counsel's decisions were strategic. Moreover, Fields must overcome the "presumption that the challenged conduct might be considered sound trial strategy." *Hanna*, 694 F.3d at 612. But Fields offers nothing to overcome that burden. So there is no reason to question the court of appeals' assessment.

Further it is not difficult to see why counsel would employ the strategy that he did. Take the severance issue. The court of appeals addressed the underlying merits of this issue and noted that in Ohio, a court was permitted to "order two or more indictments ... to be tried together, if the offenses * * * could have been joined in a single indictment or information." *Fields*, 2022 WL 622286, at *7 (quoting Ohio Criminal Rule 13). And multiple

> offenses may be charged in the same indictment ... if the offenses charged ... are of the same or similar

> character, or are based on the same act or
> transaction, or are based on two or more acts or
> transactions connected together or constituting
> parts of a common scheme or plan, or are part of a
> course of criminal conduct.

*Id.* (quoting Ohio Criminal Rule 8(a)). Additionally, as used in Rule 8(a), "'offenses is applied broadly to include not only those acts stemming from a single criminal transaction, but to *criminal transactions that may not be tied by time and place.*'" *Id.*

With the above in mind, the court of appeals explained that each of Fields's charges "involved the theft of cigarettes from a truck during a delivery in the Northeast Ohio area." *Id.* Because this was the case, "the offenses from all three Incidents could have been charged in a single indictment because the offenses are of a similar character, part of a common scheme or plan, and part of a course of criminal conduct." *Id.* As a result, the court of appeals held "that the indictments for the three separate Incidents … were properly joined for trial." *Id.*

Importantly, Fields did not challenge this merits determination before the Ohio Supreme Court, *see* Doc. 7-1, at 333–43, and he doesn't contest it now. Moreover, based on this merits determination and the lack of any prejudice, the court of appeals held that the decision to withdraw a previously filed "motion for reconsideration of joinder" was "a matter of trial strategy." 2022 WL 622286, at *14.

Fields offers nothing to question the court of appeals decision. Indeed, given the similarities between the charged offenses and the uncontested determination that the offenses were of a "similar character, part of a common scheme or plan, and part of a course of criminal conduct," there is no basis not to indulge the "presumption that the challenged conduct might be considered sound trial strategy." *Hanna*, 694 F.3d at 612. So Fields's third subclaim fails.

Next up is Fields's fourth subclaim, concerning "counter[ing] false statements." Doc. 1-1, at 4. This claim has to do with the fact that a "car recovered by Cleveland Police in connection with [its] investigation into" one of the robberies "was registered to David Fields's son," David Fields, Jr. *See* Doc 7-1, at 235–38. According to Fields's argument before the court of appeals, questioning of a police detective left the jury with the impression that the car was Fields's car rather than his son's. *Id.* at 236. And counsel did nothing to clarify the car's owner.[3] *Id.* at 236–37.

As with his fourth subground, Fields's offers nothing to overcome the presumption on which the court of appeals relied that Fields's counsel made a strategic decision. 2022 WL 622286, at *14. He also says nothing about the court's determination that the "evidence at trial established a connection

---

[3]      In his supplement to his petition, Fields mentions in relation to this subground that "DNA did not support [robbery]" and "[t]he cell phone was not corroborating evidence." Doc. 1-1, at 4. Fields's mention of DNA is apparently a reference to his counsel's appellate argument that although Fields's DNA might have been in the car—Fields had access to it—the presence of his DNA in the car did not reveal when he had access to the car. Doc. 7-1, at 237. Fields's reference to a cell phone is unexplained.

between Fields and the vehicles involved in" a different incident. *Id*. Finally, Fields says nothing about the court of appeals determination that he suffered no prejudice because (1) when it reviewed Fields's sufficiency challenge, the court of appeals found the evidence sufficient without regard to who owned the car, and (2) Fields hadn't shown "that if the clarification occurred, the outcome of the trial would have been different."

Indeed, it is not difficult to understand that counsel might have seen no benefit from clarifying that the car was Fields's son's car. After all, Fields conceded that he had access to it. *See* Doc. 7-1, at 237. Unless Fields had no access to the car—and he hasn't claimed that was the case—counsel could easily have judged that what little benefit might have accrued, if any, from clarification was not worth the effort.

Further, without a claim that he actually didn't have access to the car, there is no basis to question the court of appeals no-prejudice determination. So Field's fourth subground fails.

This leaves Fields's fifth subground, which is that counsel failed to ensure Fields's competence. In considering this issue, the court of appeals noted that in one of its previous decisions, it had held that "[i]t is reasonable to infer that counsel's decision not to pursue the issue of [an] appellant's competence was part of counsel's strategy." 2022 WL 622286, at *15 (quoting *State v. Rubenstein*, 531 N.E.2d 732, 739–40 (Ohio Ct. App. 1987)). The court remarked that in *Rubenstein*, it had relied on the fact that counsel, who was

"familiar with the defendant's mental condition, [was] in the best position to determine whether defendant was capable of assisting with his defense." *Id*.

The court of appeals next observed that the record in Fields's case showed "that Fields understood the nature of the charges against him and was able to assist in his defense." *Id*. Specifically, Fields was an active participant throughout the trial, "comment[ing] … about discovery documents that he" wanted, motions that he wanted his trial counsel to file, "his recollection of the trial court docket pertaining to motions that had been filed, and his belief that certain witnesses should not be permitted to testify." *Id*.

Fields offers no basis question these determinations. Indeed, he does not challenge the facts noted by the court of appeals. Instead, he offers that he has a history of mental health issues and that his psychiatric reports were available to his counsel. Doc. 10, at 3–5. But Fields was evaluated—*during proceedings before the trial court*—by a psychiatrist. Doc. 7-1, at 141; *see id*. at 143. And after that evaluation, both Fields and the prosecution stipulated "that [Fields] ha[d] the ability to understand the nature and objective of the court proceedings against him and ha[d] the capacity to assist in his own defense." *Id*. at 143.

In his briefing before the Ohio Supreme Court, Fields argued that his competence was called into question because he was disruptive during his trial and had to be removed from the courtroom. Doc. 7-1, at 341. Fields has not pressed this point in his in his habeas petition. But even if he had, the result

would not change because he doesn't challenge the court of appeals' determination that counsel made a strategic decision in light of his own access to and observation of Fields. Particularly in light of the uncontested factors noted by the court of appeals, there is no reason to question this determination. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011) ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). So subground five fails on the merits.[4]

### Conclusion

For all of the above reasons, the Court should dismiss Fields's petition.

Dated: August 9, 2024

*/s/James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

---

[4] In his traverse, Fields attempts to raise a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). Doc. 10, at 7. Because Fields did not raise this issue in his petition, he has forfeited it. *See Rice v. Warden, Warren Corr. Inst.*, 786 F. App'x 32, 38 (6th Cir. 2019). And because he never raised it before the Ohio court of appeals or the Ohio Supreme Court, he has also procedurally defaulted it.

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).